WAITE v. CITY OF SANTA CRUZ.

(Circuit Court, N. D. California.  September 29, 1898.)

No. 12,094.

1. JURISDICTION OF FEDERAL COURTS—ACTION ON MUNICIPAL BONDS.

The fact that a circuit court of the United States has no jurisdiction of an original proceeding for a writ of mandamus to compel municipal officers to levy a tax to pay bonds, does not affect its jurisdiction of an action at law by a citizen of another state to recover judgment on such bonds, though any judgment recovered can be enforced only by mandamus proceedings against such officers.

2. STATUTES—SPECIAL OR LOCAL LAWS—CLASSIFICATION OF CITIES.

A statute authorizing the issuance of bonds by cities or towns, except those of the first class, is not a local or special law, within Const. Cal. art. 4, § 25, subd. 33, prohibiting the passage of such laws "in any case where a general law can be made applicable." Such constitution, by authorizing the organization and "classification in proportion to population" of cities, in effect authorizes different charters for different classes.

3. MUNICIPAL BONDS—VALIDITY—ACTS OF OFFICERS DE FACTO.

In the signing and delivery to a purchaser of municipal bonds the acts of officers de facto are, as to third persons, equally as binding on the city as though they had been officers de jure.

4. OFFICERS DE FACTO—HOLDING OVER TERM.

Where a mayor and council of a city were elected and qualified, but did not actually enter upon their duties as officers for some four weeks thereafter, the outgoing officers, who continued to act during such time publicly and without objection, were the officers de facto, and their acts were, as to third persons, binding on the city.

5. MUNICIPAL BONDS—REFUNDING INDEBTEDNESS—LEGALITY.

Under a statute authorizing cities to issue bonds for the purpose of refunding their bonded indebtedness, a city has no power to refund bonds issued by a water company, and secured by mortgage on its property, which the city has since bought, subject to the mortgage.

6. PRINCIPAL AND AGENT—NOTICE TO AGENT.

A purchaser of bonds through an agent is not chargeable with the knowledge of his agent as to defects where the agent in reality acted in the transaction for his own benefit, receiving a share of the profits realized by the seller.

7. MUNICIPAL BONDS—EFFECT OF RECITALS.

Recitals in municipal bonds that such bonds are issued in conformity with the provisions of a statute authorizing cities to refund their indebted-

ness, with the constitution of the state, and an ordinance of the city, import that the ordinance is in conformity with the statute, and do not charge a holder with notice of the contents of such ordinance.

8. SAME—POWERS OF CITY—CONSTRUCTION OF STATUTE.

A statute authorizing cities to issue refunding bonds must be construed as giving authority to issue negotiable bonds in the usual form.

9. SAME—ESTOPPEL TO DENY RECITALS.

Where there was a statute authorizing cities to issue bonds to refund their bonded indebtedness, and bonds issued by a city contain recitals that they were issued in conformity with such statute for the purpose of refunding the city's bonded debt, and that every act required by the statute as a condition precedent to their issuance was performed, the city cannot defeat a recovery on such bonds as against an innocent purchaser on the ground that such recitals were false, and that a portion of the debt refunded was that of a private corporation.

10. SAME—EFFECT OF RECITALS.

It may be laid down as a general rule that when municipal bonds recite facts which, if true, show that they were issued upon the conditions and for a purpose authorized by law, a bona fide purchaser, without notice of any infirmity therein, may safely rely upon such recitals.

This is an action at law upon municipal bonds.

Chickering, Thomas & Gregory, for plaintiff.

James G. Maguire and Lindsay & Cassin, for defendant.

Frank J. Sullivan, amicus curiæ.

DE HAVEN, District Judge. This is an action at law to recover the sum of $23,100, claimed to be due on 9 refunding bonds and 282 interest coupons of $50 each, attached to the bonds sued on and other refunding bonds, alleged to have been issued by the defendant on the 16th day of April, 1894, payable on April 15, 1895. The action necessarily involves questions relating to the validity of 360 refunding bonds of $1,000 each, purporting to have been issued by the defendant on the 16th day of April, 1894. The circumstances under which these bonds were issued may be briefly stated as follows: On February 26, 1894, the defendant, city of Santa Cruz, had an outstanding bonded indebtedness of $271,000, or thereabouts, and was also the owner of certain waterworks and necessary appurtenances thereto, including land, water rights, etc., theretofore purchased by it from the City Water Company of Santa Cruz, a private corporation. The waterworks and appurtenant property were subject to a mortgage, which had been placed thereon by the City Water Company of Santa Cruz for the purpose of securing an outstanding bonded indebtedness of that corporation in the sum of $89,000, and interest thereon; and on that day the common council of the defendant city, deeming it to be for the best interest of the defendant to refund its bonded indebtedness under the provisions of an act of the legislature of the state of California entitled "An act to amend an act entitled 'An act to authorize the common council, board of trustees, or other governing body of any incorporated city or town, other than cities of the first class, to refund its indebtedness, issue bonds therefor, and provide for the payment of the same,' approved March 15, 1883," approved March 1, 1893 (St. 1893, p. 59), adopted an ordinance, which was duly approved by the mayor,

providing for a special election to be held in the city of Santa Cruz on the 13th day of March, 1894, at which there should be submitted to its qualified electors the question of refunding the outstanding bonded indebtedness of the defendant city. The indebtedness which it was thus proposed to refund was described in the ordinance as consisting not only of certain bonds of the city of Santa Cruz, amounting to the sum of $271,000, but also "eighty-nine (89) first mortgage bonds (with interest thereon from November 1, 1893) of the corporation, the City Water Company of Santa Cruz, heretofore issued by said corporation, the City Water Company of Santa Cruz, which bonds bear date May 1, 1890, and are of the denomination of one thousand (1,000) dollars each, and bear interest at the rate of six (6) per cent. per annum, payable semiannually, and are secured by a mortgage or deed of trust upon the property known as the 'City Waterworks of Santa Cruz,' executed by the City Water Company of Santa Cruz, as party of the first part therein, to the Holland Trust Company of New York, as trustee, party of the second part therein; and which said bonds outstanding were, at the time of the conveyance by the City Water Company of Santa Cruz to the city of Santa Cruz, of the property known as the 'City Waterworks,' and now are, a valid lien and charge upon said property known as the 'City Waterworks,' and became thereby a part of the bonded indebtedness of the city of Santa Cruz." More than two-thirds of the qualified electors of the defendant voted at the special election thus called in favor of the proposition to refund the then outstanding bonded indebtedness of the defendant as described in the ordinance. Thereafter, on March 26, 1894, the common council of the defendant passed, and its mayor approved, an ordinance for the purpose of carrying into effect the will of the electors of the defendant, as expressed at such special election. This ordinance provided for the issuance of 360 interest-bearing bonds of the defendant of the denomination of $1,000 each, and also directed that such bonds should be signed by the mayor and city clerk, and that each should contain the following recitals:

"This bond is one of a series of bonds of like date, tenor, and effect issued by the said city of Santa Cruz for the purpose of refunding the bonded indebtedness of said city, and issuing bonds therefor, and providing for the payment of the same, under and in pursuance of and in conformity with the provisions of an act of the legislature of the state of California, 'An act to amend an act entitled "An act authorizing the common council, board of trustees or other governing body of any incorporated city or town, other than cities of the first class, to refund its indebtedness, issue bonds therefor, and provide for the payment of the same," approved March 15, 1883,' approved March 1, 1893, and in pursuance of and in conformity with the constitution of the state of California and the ordinance of the city of Santa Cruz, and in pursuance of and in conformity with a vote of more than two-thirds of all the qualified electors of said city of Santa Cruz voting at a special election duly and legally called and held and conducted in said city, as provided under said act, on Tuesday, the 13th day of March, 1894, notice thereof having been duly and legally given and published in the manner as required by law, and after the result of said election had been duly canvassed, found, and declared in the manner required by law; and it is hereby certified and declared that all acts, conditions, and things required by law to be done, precedent to and in the issue of said bonds have been properly done, happened, and performed in legal and due form, and as required by law."

The ordinance further directed that such bonds should, after public notice inviting bids therefor, be sold to the highest bidder for not less than their face value in United States gold coin, to be paid on delivery of said bonds at the city treasurer's office in the city of Santa Cruz. The bonds were offered for sale, but there were no bidders for the same, and on April 16, 1894, the date to which the common council of the defendant had regularly adjourned, there were present William T. Jeter, assuming to act as mayor, and J. Howard Bailey, F. J. Hoffmann, E. G. Green, and F. W. Lucas, assuming to act as the common council of the defendant. At this meeting a proposition theretofore made by Coffin & Stanton to take all of said bonds was accepted upon condition that satisfactory security for its faithful performance by Coffin & Stanton should be furnished. This proposition was dated February 27, 1894, and was, in substance, one by which Coffin & Stanton proposed to purchase the refunding bonds at par value less 3 per cent., without the payment of any money at the time of their delivery, or giving any other consideration therefor than their promise to take up the outstanding bonds which were to be refunded, and to forward the same, "from time to time, to the city for cancellation." On April 23, 1894, the said William T. Jeter, assuming to act as mayor, and the said Bailey, Hoffmann, Green, and Lucas, assuming to act as the common council of the defendant, publicly met pursuant to adjournment, and, without protest from any one, accepted and approved a bond presented by Coffin & Stanton for the faithful performance by them of the agreement contained in the foregoing proposition, and thereupon directed the city clerk of the city of Santa Cruz to deliver to that firm the entire issue of the refunding bonds referred to. The bonds were, in accordance with this direction, delivered to Walter Stanton, of the firm of Coffin & Stanton, on April 24, 1894, and thereafter Coffin & Stanton sold the same to various parties, from some of whom the plaintiff derived title to the bonds and coupons sued on. The plaintiff is only the nominal owner of said bonds, the same having been assigned to him for the purpose of collection only. Coffin & Stanton never complied in whole or in part with the agreement under which the bonds were delivered to them, and the city of Santa Cruz never received any benefit whatever from their sale, the entire proceeds thereof having been appropriated to their own use by Coffin & Stanton, and that firm is insolvent. The bonds are under the seal of the defendant, contain the recitals above set out, and are signed: "Wm. T. Jeter, Mayor of the City of Santa Cruz. Attest: O. J. Lincoln, City Clerk."

Upon the foregoing facts, and others which will be stated in discussing the questions to which they particularly relate, the defendant contends: First. That the court has no jurisdiction of the action. Second. That the act of the legislature under which the bonds were issued is in conflict with the constitution of the state of California. Third. That William T. Jeter was not mayor of the defendant city, neither de jure nor de facto, at the time when a portion of the bonds were signed by him. Fourth. That Jeter and the other persons above mentioned, who, on April 16 and 23, 1894, assumed to act as the mayor and common council of the defendant

city, and accepted the proposition of Coffin & Stanton for the purchase of the bonds, and directed their delivery to that firm, were not officers of the defendant, neither de jure nor de facto, and all of their acts in relation thereto are absolutely void. Fifth. That the bonds are void, because issued in part for the purpose of refunding the private indebtedness of the City Water Company of Santa Cruz, and also because they were delivered to Coffin & Stanton in violation of law and of the ordinances under which they were issued. Sixth. That the assignors of plaintiff had notice of all the foregoing facts relied upon as a defense to the action when they purchased the bond and coupons sued on.

In answer to these contentions of the defendant, it is claimed in behalf of the plaintiff: First. That the persons assuming to act as mayor and common council of the defendant on April 16, 1894, and April 23, 1894, were de facto officers of the defendant. Second. That the assignors of plaintiff were bona fide purchasers of said bonds, without notice, and that the defendant is therefore estopped from disputing the truth of the recitals contained in the bonds.

1. The objection that the court has no jurisdiction of the action was presented by the demurrer to the complaint, but it does not seem to have been discussed or noticed by Judge McKenna, then presiding here, in his opinion overruling the demurrer (Waite v. City of Santa Cruz, 75 Fed. 967); and as it is still insisted upon, and has been argued with great earnestness, it is necessary to now consider it. In support of this objection it is said the defendant did not contract to pay the bonds out of any property or assets subject to execution, but only out of taxes to be levied and collected by its officers, and from this it is argued that the action is substantially a proceeding in the nature of an application for a writ of mandamus to compel the officers of the defendant to perform the duty of levying and collecting the necessary taxes for the payment of such bonds, since, without the issuance of such writ, a judgment in favor of plaintiff could not be enforced; and cases are cited to the effect that the circuit courts of the United States have no jurisdiction to entertain an original proceeding in mandamus. Bath Co. v. Amy, 13 Wall. 244; Graham v. Norton, 15 Wall. 427; Rosenbaum v. Board, 28 Fed. 223; Same v. Brauer, 120 U. S. 455, 7 Sup. Ct. 633. That circuit courts of the United States have no jurisdiction to entertain an original proceeding for the issuance of a writ of mandamus to compel the officers of municipal corporations to perform duties imposed upon them by the laws of the state under which they exist cannot be doubted, and is fully sustained by the above, and by many other, cases which could be cited to the same effect. This, however, is not an original proceeding for the issuance of a writ of mandamus. The action is one at law for the purpose of recovering a money judgment, each of the bonds sued on containing a promise upon the part of the defendant "to pay to the bearer, for value received, the sum of one thousand dollars," etc. Of such an action this court has jurisdiction, the plaintiff being a citizen of another state, and the amount in controversy exceeding $2,000. Rev. St. § 629, as amended by Act Aug. 13, 1888 (25 Stat. 433). The cases of Greene Co. v. Daniel and Pickens Co. v. Same, 102 U. S. 187, were

not unlike this. These were actions at law to recover upon coupon bonds issued by the counties named, under the provisions of a statute of Alabama, the statute also making it the duty of certain officers to levy and collect a tax to pay the same. The question of the jurisdiction of the court was not raised, but in discussing the sufficiency of the complaint the court, after stating that a mandamus would lie in the courts of the state of Alabama to compel the levying and collection of a tax to pay what was due on the bonds without first reducing the bonds to judgment, said:

"The rule is different, however, in the courts of the United States, where such a writ can only be granted in aid of an existing jurisdiction. There a judgment at law on the coupons is necessary to support such a writ. The mandamus is in the nature of an execution to carry the judgment into effect. Bath Co. v. Amy, 13 Wall. 244; Graham v. Norton, 15 Wall. 427. A suit, therefore, to get judgment on the bonds or coupons is part of the necessary machinery which the courts of the United States must use in enforcing the claim, and the jurisdiction of those courts is not to be ousted simply because in the courts of the state a remedy may be afforded in another way."

In Heine v. Commissioners, 19 Wall. 655, the supreme court, speaking by Mr. Justice Miller, point out that upon the refusal of a municipal corporation to pay its bonds the appropriate way to proceed in the federal courts is to first sue at law, and obtain a judgment establishing the validity of the bonds, and then, if necessary, obtain a mandamus to enforce the judgment. This course was followed and upheld in the following, among many other, cases which could be cited: Commissioners v. Aspinwall, 24 How. 376; Von Hoffman v. City of Quincy, 4 Wall. 535; Riggs v. Johnson Co., 6 Wall. 166; Walkley v. City of Muscatine, Id. 481. A consideration of these cases, as well as section 629, Rev. St. U. S., above cited, leads to the conclusion that the present action is clearly within the jurisdiction of the court.

2. Cities of the first class (those having a population of more than 100,000) are expressly excepted from the operation of the statute under which the bonds were issued, and because of this exception the defendant insists that the statute is in conflict with subdivision 33 of section 25 of article 4 of the constitution of the state of California, which forbids the legislature to pass a local or special law in any case where a general law can be made applicable. A provision like this is to be found in the constitutions of many of the states, and has been the subject of much judicial discussion; and it seems to have been uniformly held by the courts that it is not to be construed as depriving the legislature of the power to enact laws applicable only to a particular class of persons or cities which may reasonably be thought to require rules or regulations different from those of other classes. Abeel v. Clark, 84 Cal. 226, 24 Pac. 383; McDonald v. Conniff, 99 Cal. 386, 34 Pac. 71; People v. Henshaw, 76 Cal. 436, 18 Pac. 413; People v. Central Pac. R. Co., 105 Cal. 576, 38 Pac. 905; State v. Pond, 93 Mo. 606, 6 S. W. 469; State v. Graham, 16 Neb. 74, 19 N. W. 470; Johnson v. City of Milwaukee (Wis.) 60 N. W. 270; State v. Hawkins, 44 Ohio St. 98, 5 N. E. 228; Cooley, Const. Lim. p. 390. The constitution of the state of California recognizes the fact

that it is wise to classify cities and towns with reference to population, so that legislation relating to their organization may be adapted to the interests or necessities of the different classes. Section 6 of article 11 of that constitution provides:

"Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed."

The word "organization," as here used, has reference to the powers which may be given to municipal corporations, and it is clear that by this section the legislature is authorized to provide different constitutions or charters for different classes of municipal corporations; that is, the legislature may, in its discretion, give to one class powers which are withheld from another. Now, the statute under consideration here confers upon municipal corporations other than those of the first class the power to issue negotiable bonds for the purpose of refunding their outstanding indebtedness. The statute deals with a subject proper to be considered by the legislature in the organization of cities and towns in the first instance, or in subsequent legislation relating thereto. Viewed in this light, it is apparent that the statute is not a special or local statute, within the meaning of the constitution prohibiting that character of legislation; and this conclusion is fully sustained by the cases above cited. The question is not whether it was wise to deny to municipal corporations of the first class the power which by this statute is conferred upon all others. The statute is not to be declared unconstitutional simply because, in the opinion of the court, its provisions might well have been extended to all municipal corporations. To do this the court would be substituting its own judgment as to the wisdom and expediency of the statute for the judgment of the legislature, and this it is not authorized to do.

3. Is the action of William T. Jeter in signing the bonds to be regarded as that of its mayor, and were the said Jeter and the other persons, who assumed to act as members of its common council, and caused the bonds to be delivered to Coffin & Stanton, and thus put in circulation, de facto officers of the defendant? These questions may be considered together. They are very important, and have been most elaborately argued by the counsel for the respective parties. The facts out of which they arise are these: On April 11, 1892, William T. Jeter was elected mayor of the defendant city, and J. Howard Bailey, J. F. Hoffmann, E. G. Green, and F. W. Lucas were at the same time elected members of its common council, and all qualified and entered upon the duties of their respective offices. The charter of the city of Santa Cruz (St. Cal. 1875-76, p. 189) provides that its mayor and common council shall hold office for a term of two years and until their successors are elected and qualified. On the 9th day of April, 1894, Robert Effey was elected mayor of the defendant city to succeed William T. Jeter, and Henry G. Ensnell, John Howard Bailey, J. D. Maher, and Frank K. Roberts were at the same time elected members of the common council. Effey qualified as mayor between the hours of 11 o'clock a. m. and 2 o'clock p. m. of April 16,

89 F.—40

1894, and those chosen councilmen qualified before the time at which the adjourned meeting of the common council of said city was held, on the evening of the same day. In point of fact, the persons so elected mayor and members of the common council, on April 9, 1894, did not, with the exception of Bailey, who was re-elected councilman, actually enter upon their duties as such officers until May 7, 1894. The said William T. Jeter, Bailey, Hoffmann, Green, and Lucas continued to act as mayor and members of the common council of the city of Santa Cruz until May 7, 1894, without protest from any person, and held seven public meetings of said council between and including the days of April 16, 1894, and May 7, 1894, and their proceedings were regularly recorded by the city clerk in the proper record books of the city. At one of these meetings—that of April 16, 1894—the proposition of Coffin & Stanton in relation to the purchase and sale of the bonds was accepted upon condition that they should furnish a satisfactory bond for the performance of their agreement, and at the succeeding meeting of April 23, 1894, the bond tendered by them for this purpose was approved, and the city clerk directed to deliver the bonds to them upon the terms of their agreement. This was done, and the bonds thus put in circulation. Many of the bonds so delivered to Coffin & Stanton were signed by William T. Jeter, assuming to act as mayor, on the afternoon of April 16, 1894, after the qualification of his successor; and whether the bonds sued on were among those signed by Jeter before or after the hour when his successor qualified does not appear. It is claimed by the defendant that, as it is not shown that the bonds sued on were signed by William T. Jeter before the qualification of his successor in the office of mayor, the plaintiff has failed to prove that the bonds were signed by an officer authorized to do so, and they must, therefore, be held void, even in the hands of bona fide purchasers, under the rule declared in Coler v. Cleburne, 131 U. S. 162, 9 Sup. Ct. 720. That case is not authority for the proposition that the action of a de facto officer in signing bonds would not be as binding upon the municipality for which he assumes to act as that of an officer de jure; and it seems clear to me that, if Jeter was the de facto mayor when he signed the bonds sued on, then such signing by him was a compliance with the ordinance requiring them to be signed by the mayor; and so, also, if he was de facto mayor, and those assuming to act as the common council of the defendant were de facto members of the common council at the time when he and they assumed as mayor and common council to accept the proposition of Coffin & Stanton in relation to the bonds, and directed their delivery to that firm, then such acts upon their part are to be treated, so far as concerns the public and third persons having an interest in what was done by them, as the acts of the de jure mayor and common council of the city. The rule that the acts of a de facto officer are valid as to the public and third persons is firmly established, although it is sometimes difficult to determine whether the evidence is such as to warrant a finding that a particular act or acts, the legality of which may be in issue in a given case, were those of a de facto officer. The contention of the defendant is that Jeter was not the de facto mayor at the time of the signing and delivery of the bonds, nor were the old

members of the common council, who continued to act as such after the qualification of their successors, and until after the bonds were delivered to Coffin & Stanton, de facto members of the common council of defendant, after the qualification of their successors. Whether one was or was not a de facto officer at the time when he assumed to perform duties belonging to a public office is a mixed question of law and of fact. State v. Taylor, 108 N. C. 196, 12 S. E. 1005; U. S. v. Alexander, 46 Fed. 728. And in passing upon the question presented by defendant's contention upon this point it is well to first consider what facts are sufficient to constitute a de facto officer. A de facto officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office, and discharging its duties, in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. When a person is found thus openly in the occupation of a public office, and discharging its duties, third persons having occasion to deal with him in his capacity as such officer are not required to investigate his title, but may safely act upon the assumption that he is a rightful officer. Thus it is said in Petersilea v. Stone, 119 Mass. 468:

"Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even so far as to see that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are entitled to treat him as such officer; and, if they employ him as such, should not be subjected to the danger of having his acts collaterally called in question."

So, also, in Jhons v. People, 25 Mich. 503, it is said:

"Persons in the actual and unobstructed exercise of office must be held to be legal officers, except in proceedings where their official character is the issue to be tried as against themselves."

To the same effect, also, may be cited the case of Attorney General v. Crocker, 138 Mass. 214. That case was one in which the validity of a town-meeting election was involved, and the case turned upon the question whether one Crocker, who had assumed to act as town clerk at such town meeting, was an officer de facto. The appointment under which he acted was void, and there was an actual incumbency by him of the office, and acquiescence of the public in his assumption of its duties, only during the one meeting at which the election was conducted. These facts were deemed by the court sufficient to justify the conclusion that Crocker was reputed to be town clerk at that time, and a de facto officer in contemplation of law; and in concluding its opinion the court thus declared the law to be:

"The public and parties, having rights depending upon official acts, are not so much concerned with the title to an office as they are that the duties of the office shall be performed, and the rights depending upon their performance secured and protected; and when they find an actual incumbent of an office performing its duties they have a right to rely upon his acts as done by virtue of his office."

In Hamlin v. Kassafer, 15 Or. 456, 15 Pac. 778, it was held that a justice of the peace who continued in the discharge of the duties of such office after the expiration of the legal term for which he had been

elected was to be regarded as a de facto officer. The court, in that case, said:

"To constitute a person an officer de facto, he must be in the actual possession of the office, and in the exercise of its functions, and in the discharge of its duties. When this is the fact necessarily, there can be no other incumbent of the office. An officer de jure is one who has the lawful right to the office, but who has either been ousted from, or never actually taken possession of, the office."

In State v. Williams, 5 Wis. 308, it was held that a governor who continued to hold office illegally after the expiration of his term of office and the qualification of his successor was a de facto governor, and that an act of the legislature approved by him during the time of his illegal incumbency of the office of governor was valid. The case, however, which is most like this in its facts, is that of Magenau v. City of Fremont, 30 Neb. 843, 47 N. W. 280. That case was one involving the validity of an ordinance purporting to have been passed April 9, 1890, and it appeared that E. N. Morse and D. Hein were elected as councilmen of the city of Fremont on April 1, 1890, as the successors to J. J. Lowry and C. A. Peterson, and two days before the passage of the ordinance referred to had qualified as such councilmen, and, upon such qualification, became de jure members of the council. They did not, however, actually enter upon the duties of their office immediately upon qualifying, and Peterson and Lowry, notwithstanding the expiration of their terms of office, were present, and acted as members of the council when the ordinance in question was passed. The court thus stated the question before it:

"It is conceded that all who participated at the meeting when the ordinance was adopted were legal members of the council except Peterson and Lowry, whose right to act is questioned on the ground that their successors had previously qualified on April 7th. The statute requires that two-thirds of all the members of the council shall be necessary to constitute a quorum for the transaction of business. It is obvious that, if Peterson and Lowry could not lawfully act with the council at that meeting, no quorum was present, and the ordinance was invalid."

Then, after proceeding to show that under the laws of Nebraska the terms of Peterson and Lowry expired upon the qualification of their successors, the court said:

"While Morse and Hein had qualified, they had not, as yet, taken their seats in the council, or participated in the proceedings of that body. The names of Lowry and Peterson appeared upon the roll of members, and they were recognized as such by other members of the council, as well as by the mayor and city clerk. They took part in the proceedings of the council on April 9th, without objection from any one, although Morse and Hein were at the time in the council chamber. We conclude, therefore, that Morse and Hein were de jure officers, and that Lowry and Peterson were de facto members of the city council. The cases are numerous which hold that the acts of a de facto officer, so far as they involve the interests of the public or third persons, are as valid and binding as though he was an officer de jure."

And upon that reasoning the court held the ordinance passed under the circumstances above stated to be valid.

The foregoing cases sufficiently illustrate the principle upon which courts proceed in determining whether one who has assumed to act as a public officer was at the time an officer de facto, and it only remains

to apply the rule which they establish to the facts which have been already stated as appearing in the present case, and in doing so there is but one conclusion that can be reached, and that is that Jeter was the de facto mayor of the city of Santa Cruz on the 16th day of April, 1894, at the time when he signed the bonds in question, and he and the persons who assumed to act as members of its common council on the 16th and 23d of April, 1894, were on those days the de facto mayor and the de facto members of the common council of the defendant city.

4. The issuance of bonds for the purpose of refunding the indebtedness of the City Water Company of Santa Cruz, a private corporation, was not authorized by the act under which the bonds in controversy purport to have been issued; and as the bonds issued by the defendant for that purpose were not segregated from others of the same issue the court is not able to determine which particular bonds were to be devoted to the purpose of refunding the indebtedness of the private corporation, and the plaintiff is not entitled to recover in this action (Ætna Life Ins. Co. v. Lyon Co., 44 Fed. 329, and Hedges v. Dixon Co., 150 U. S. 182, 14 Sup. Ct. 71), unless his contention that he is a bona fide purchaser without notice of this infirmity in the bonds, and as such is protected by the recitals contained therein, can be sustained.

First, as to the fact, is the plaintiff a bona fide purchaser without notice? The plaintiff is only the nominal holder of the bonds and coupons sued on, they having been assigned to him for purposes of collection only. It therefore becomes necessary to determine whether his assignors, who are the real owners of such bonds and coupons, were purchasers without notice. It is conceded that the Northern Counties Investment Trust Company, Limited, the owner of three of the coupons sued on, was not a bona fide purchaser. There are other assignors of plaintiff whose rights are disputed by defendant, but it is only deemed necessary to consider, in this opinion, whether Wallace & Co., who own eight of the nine bonds sued on, were bona fide purchasers without notice. It is not claimed that they had actual notice of any of the matters which defendant now urges against the validity of the bonds. The evidence shows that on or about September 22, 1894, this firm purchased from Coffin & Stanton 150 of the refunding bonds referred to in the complaint in this action, giving in exchange therefor 435 shares of the capital stock of the Page Belting Company and $116,400 in money. In making this exchange Wallace & Co. were represented by F. H. Prince & Co., who were also at the same time acting for Coffin & Stanton in the sale of the bonds. Prince & Co. received $2,500 from Wallace & Co. for services as their agents in the matter, and were also to receive from Coffin & Stanton, for services rendered to them in the same transaction, a division of all profits which should be realized by Coffin & Stanton upon the resale of the stock of the Page Belting Company. Prior to effecting the exchange of these bonds for the sum of money above stated and the stock of the Page Belting Company, the ordinances under which the bonds were issued were placed in the hands of Prince & Co. for examination, but there is an entire absence of evidence upon the point whether the ordinances were in fact read by them; and, whatever

the fact may be in relation to this, I do not think plaintiff's right to recover is affected thereby. If it should be conceded that Prince & Co. had notice that the bonded indebtedness of the private corporation was described in the ordinances as a part of the bonded indebtedness of the defendant to be refunded by the issuance of the bonds in controversy, their knowledge was not communicated to Wallace & Co. The question, then, arises whether such knowledge, if possessed by Prince & Co., should be imputed to Wallace & Co. In my opinion, it should not. To the general rule that notice to an agent, while he is engaged in transacting business for his principal, of matters relating to such business, is notice to the principal, there is an exception which is as well settled as the rule itself. The exception is that when, in the transaction of business intrusted to him by his principal, the agent really acts for his own benefit, or for the benefit and advantage of the other party to the transaction, notice to him is not deemed constructive notice to his principal. Benedict v. Arnoux, 154 N. Y. 715, 49 N. E. 326; Dillaway v. Butler, 135 Mass. 479; De Kay v. Water Co., 38 N. J. Eq. 158. The facts of this case bring it clearly within the exception stated and applied in the cases just cited. When an agent assumes to act on account of his principal, and at the same time is to share in the profits which the other party to the contract may gain in the business transacted, the agent cannot be said to be acting in that matter in good faith towards his principal, but he is really acting for himself, as well as for the benefit and advantage of the other party, with whom he is to share the profits. This was the position occupied by Prince & Co. in the transaction by which Wallace & Co. became purchasers of the bonds in suit, and, such being the case, any knowledge possessed by them, showing that some of the bonds purchased were issued for a purpose not authorized by law, is not to be imputed to Wallace & Co.

It is further claimed by the defendant that M. F. Dickinson, one of the attorneys who passed upon the validity of the bonds, was also the agent of Wallace & Co. in that matter; that his opinion given to Prince & Co. shows that he had the ordinances under which the bonds were issued before him, and that the knowledge which he obtained therefrom must be imputed to Wallace & Co. In passing upon this contention of defendant it will be sufficient to say that the evidence points to the fact that Mr. Dickinson was employed by Prince & Co. in the matter referred to upon their own account, and not as the attorney of Wallace & Co. I do not overlook the fact, which is strongly urged by defendant, that during the negotiations Wallace & Co. expressed themselves as not willing to rely upon the opinions of certain attorneys submitted to them by Prince & Co. concerning the validity of the bonds, and asked them for the opinion of Mr. Dickinson, but this circumstance is not inconsistent with the conclusion, which I think is sustained by a consideration of the entire evidence, that the opinion thereafter obtained from him was procured by Prince & Co. on their own account. The testimony of Sumner Wallace, of the firm of Wallace & Co., is that all of the legal opinions submitted to his firm, including that of Mr. Dickinson, were procured by Prince & Co., or by Coffin & Stanton. The only other witness giving evidence

bearing upon the question is F. H. Prince, and he testified that Mr. Dickinson was employed by Prince & Co.; and there is nothing in his deposition from which the inference can be drawn that in the matter of employing Mr. Dickinson that firm was acting, or supposed they were acting, as agents of Wallace & Co., or that Dickinson was to be paid by the latter firm. Prince & Co. were directly interested in effecting the exchange of the Page Belting Company's stock for the bonds by reason of the commission they were to receive from Wallace & Co. on the one side and the profits they were to share with Coffin & Stanton on the other; and in view of this interest it is not difficult to believe that, after learning from Wallace & Co. that an opinion from Mr. Dickinson would be satisfactory to them, Prince & Co. obtained the opinion of that gentleman on their own account, so as to insure the success of the negotiations in which they were engaged. At any rate, the direct evidence of F. H. Prince is that Dickinson was employed by Prince & Co., and, for the reasons stated, I am disposed to regard this statement as true.

It is next insisted by defendant that Wallace & Co. must be deemed to have purchased such bonds with notice that they were issued in part to refund and take up the mortgage bonds of the private corporation, because each bond contained the recital that it was issued "in pursuance to and in conformity with the constitution of the state of California and the ordinances of the city of Santa Cruz." The proposition for which the defendant contends upon this point is that by this general reference to the ordinances of the city all purchasers were put upon inquiry as to the terms of the ordinances under which the bonds were issued; and that, as it appears from these ordinances that a part of the refunding issue was to be used in refunding the mortgage bonds of the private corporation, all persons purchasing the bonds are to be charged with notice of this fact. I do not think this contention can be sustained, although it is apparently supported by the case of Post v. Pulaski Co., 1 C. C. A. 405, 49 Fed. 629, cited by the counsel for defendant. The recital above quoted does not stand alone. In addition to and immediately preceding it the bonds under consideration expressly state that they were "issued for the purpose of refunding the bonded indebtedness" of the city of Santa Cruz, and in conformity with the act of the legislature which they recite. The further statement that their issuance was also in conformity with the ordinances of the city of Santa Cruz does not detract from or modify the effect of the prior recital concerning the purpose for which the bonds were issued, and certainly cannot be construed as a warning to purchasers to examine the ordinances, and determine for themselves, and at their peril, whether the previous representation in relation to the purpose for which the bonds were issued was true or false. On the contrary, this general reference to the ordinances of the city of Santa Cruz must be read in connection with the other parts of the instrument in which it is found; and when this is done, and all the recitals are given effect, it is at once seen that they import not only that the bonds were issued in conformity with the act of the legislature, "but that the ordinances of the city council were in conformity with the statute." Evansville v. Dennett, 161 U. S. 434, 16 Sup. Ct.

613. See, also, Hackett v. Ottawa, 99 U. S. 86, and the well-considered case of Risley v. Village of Howell, 12 C. C. A. 218, 64 Fed. 453.

5. In view of what has been said, the conclusion necessarily follows that Wallace & Co. were bona fide purchasers of the bonds and coupons assigned to plaintiff, and without notice of any infirmity attaching thereto. What effect, then, is to be given the recitals contained in the bonds? Is defendant estopped from disputing the truth of such recitals? The argument of counsel for defendant on this point is that there was a total want of power in the mayor and common council of the defendant to refund the private indebtedness of the City Water Company of Santa Cruz; that in issuing bonds for that purpose these officers exceeded the authority conferred upon them by the statute, and their act in that respect was not merely an irregularity, but absolutely void; and that the defendant is not estopped by recitals contained in bonds thus issued without authority from showing that such recitals are false, and that the bonds were issued in part to refund the indebtedness of the private corporation, and are therefore void. This argument has received, as it deserved, most careful consideration, and some of the cases cited by counsel in its support will be referred to. In one of these—that of Hopper v. Town of Covington, 118 U. S. 148, 6 Sup. Ct. 1025—it was said:

"When the law confers no authority to issue the bonds in question, the mere fact of their issue cannot bind the town to pay them, even to a purchaser before maturity, and for value."

The court in the case just cited was not dealing with the question as to how far a bona fide purchaser of municipal bonds is protected by recitals contained therein, the bonds before it containing none. The entire scope of the decision in that case is that it is incumbent upon a plaintiff suing upon bonds which contain no recitals to state in his complaint the facts showing that the municipality was authorized to issue the bonds. This appears very clearly from the opinion, in which the court, in addition to the extract above quoted, said:

"The bonds in suit containing no statement of the purpose for which they were issued, and no recital which can bind the town by way of estoppel, any one suing upon the bonds is bound to allege and prove the authority of the town to issue them."

In Hayes v. Holly Springs, 114 U. S. 120, 5 Sup. Ct. 785, the validity of the bonds depended upon the fact that the town had been authorized to issue the same at a special election held for that purpose. The bonds upon their face recited that such election had been had, but in point of fact, at the time of the election, there was no statute in existence which authorized it. Of course, in such a case the purchaser of the bonds would be charged with notice of the nonexistence of a statute authorizing the election, the authority of the city to issue its bonds depending upon the existence of such a statute; and it was in respect to that state of facts that the court said:

"Even a bona fide holder of a municipal bond is bound to show legislative authority in the issuing body to create the bond. Recitals in pais, operating by way of estoppel, may cure irregularities in the execution of a statutory power, but they cannot create it. If, as in the present case, legislative authority was wanting, the bond has no validity."

In Merrill v. Monticello, 138 U. S. 673, 11 Sup. Ct. 441, nothing more was decided than that the implied power of the town of Monticello to borrow money for corporate purposes did not carry with it the further power to issue negotiable bonds for the amount so borrowed.

In Daviess Co. v. Dickinson, 117 U. S. 657, 6 Sup. Ct. 897, it was held that bonds issued by a county in excess of the amount authorized by law were void, and that the county was not estopped from making such defense as to the overissue by the unauthorized certificate of the county judge that the bonds were issued pursuant to the statute. The point of the decision in relation to the noneffect of the certificate referred to is contained in the following language:

"The certificate is not a recital in the bond. It is not the act of the county court; is not under its seal, nor signed by its clerk; but is simply the certificate of the person holding the office of judge of that court. Neither the statute, nor the vote of the people, nor the order of the county court empowered him to make such a certificate, or to determine the question whether the county court had exceeded the power conferred upon it."

Manifestly, that case is not authority upon the point now under discussion.

In East Oakland Tp. v. Skinner, 94 U. S. 255, the question as to how far a municipality is estopped by recitals of matters of fact contained in negotiable bonds issued by it was not involved, and was neither decided nor discussed. The bonds upon which a recovery was sought in that case were issued to pay a subscription of the town of East Oakland, in the state of Illinois, to the capital stock of a railroad corporation. The constitution of Illinois prohibited the town from making such subscription, unless authorized by a vote of the people; and there was no statute providing for such an election. The bonds showed upon their face the purpose for which they were issued, and consequently carried notice to purchasers that they were issued to pay a subscription prohibited by the constitution, because not authorized by any statute. It was in view of these facts that the court, in its opinion, used the general language relied upon by the defendant here, to the effect that there was a total want of authority in the town to issue them, and there could be no bona fide holding of such bonds. The case is the same in principle as that of Hayes v. Holly Springs, 114 U. S. 120, 5 Sup. Ct. 785, already mentioned.

The case at bar is, in its facts, entirely different from those to which reference has been made, and by reason of this there is a broad and clear principle of law to be applied in its decision, which was not involved in either of the cases above referred to. The statute under which the bonds in suit purport to have been issued authorized the defendant, upon conditions named therein, to issue bonds for the purpose of refunding that part of its indebtedness evidenced by bonds and warrants. The authority thus given must be construed as one to issue negotiable bonds in the usual form (City of Cadillac v. Woonsocket Inst. for Savings, 7 C. C. A. 574, 58 Fed. 935; Ashley v. Board, 8 C. C. A. 455, 60 Fed. 55), with recitals showing their binding obligation; and there can be no doubt that, if the recitals in these bonds are true, they are valid obligations of the defendant. In view, then,

of the fact that there was legislative authority for the issuance by the defendant of bonds of the character of those sued on, what effect is to be given to the recital that every act required by the statute as a condition precedent to their issuance was performed, and the further recital that the bonds were issued for the precise and definite purpose prescribed by law, to wit, to refund the bonded indebtedness of the defendant?   Can the defendant, as against an innocent purchaser, be permitted to defeat a recovery upon such bonds by showing the falsity of the recitals appearing upon their face?   Upon the point presented by these questions there is great unanimity in the decisions of the federal courts in holding that the effect of recitals like those contained in the bonds under consideration is to estop the municipality from averring against their truth, and the case falls clearly within the principle declared in Orleans v. Platt, 99 U. S. 682, in the following language:

"Where the bonds on their face recite the circumstances which bring them within the power, the corporation is estopped to deny the truth of the recital."

. The decision in Hackett v. Ottawa, 99 U. S. 86, announces the same rule.   In that case the defendant insisted that there was a total want of authority to issue the bonds upon which that action was based, because they were not issued for a municipal purpose, just as here the defendant contends that some of these bonds were not issued for the authorized municipal purpose of refunding its indebtedness, but to refund the private indebtedness of the City Water Company of Santa Cruz.   The court, however, in that case held that, inasmuch as the bonds recited that they were issued for a municipal purpose, the city was estopped from showing that such recital was untrue.   The court said:

"The city is therefore estopped by its own representations to say, as against a bona fide holder of the bonds, that they were not issued or used for municipal or corporate purposes.   It cannot now be heard, as against him, to dispute their validity.   *   *   *   It would be the grossest injustice, and in conflict with all past utterances of this court, to permit the city, having power under some circumstances to issue negotiable securities, to escape liability upon the ground of the falsity of its own representations, made through official agents, and under its corporate seal, as to the purposes with which these bonds were issued."

The authority of these cases has never been questioned in any of the later decisions of the supreme court, and the principle upon which they were decided has been often reaffirmed by that court.   The recital found in each of the bonds sued on that it was issued for the purpose of refunding the bonded indebtedness of the city of Santa Cruz, is the statement of a fact, and not the recital of a conclusion of law.   When a municipality is authorized, as was the defendant here, to issue bonds containing recitals of matters of fact, showing that they were issued in accordance with law, and for a purpose authorized by the law, the duty of ascertaining the truth of the facts recited must necessarily rest upon its officers; and that in such a case the municipality is estopped, as against a bona fide holder, from disputing the truth of the recitals contained in the bonds issued by it, is fully sustained by

Commissioners v. Aspinwall, 21 How. 539; Chilton v. Town of Gratton, 82 Fed. 873; Sherman Co. v. Simons, 109 U. S. 735, 3 Sup. Ct. 502; Town of Coloma v. Eaves, 92 U. S. 484; Bernards Tp. v. Morrison, 133 U. S. 523, 10 Sup. Ct. 333; Chaffee Co. v. Potter, 142 U. S. 355, 12 Sup. Ct. 216; Provident Trust Co. v. Mercer Co., 170 U. S. 593, 18 Sup. Ct. 788; West Plains Tp. v. Sage, 16 C. C. A. 553, 69 Fed. 943; Risley v. Village of Howell, 12 C. C. A. 218, 64 Fed. 453; City of Huron v. Second Ward Sav. Bank, 30 C. C. A. 38, 86 Fed. 272. The rule declared in these cases is founded upon principles of common honesty, which municipal corporations, as well as individuals and private corporations, must observe at their peril, because, as was said by the court in Bissell v. City of Jeffersonville, 24 How. 287:

"A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with other parties, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct has superinduced."

There are many other objections urged by the defendant against the validity of the bonds, which need not be noticed at length, as what has been said is decisive of the questions which they present. Thus, the objection that, assuming that all the bonds were issued for a municipal purpose, the issue was in excess of the amount authorized by the statute, even if true, cannot, under the authority of Chaffee Co. v. Potter, 142 U. S. 355, 12 Sup. Ct. 216, be availed of as a defense in the face of the express recitals of the bonds, no one bond showing upon its face the total amount of bonds issued. So, also, in relation to the objection that the polls were not kept open during the entire time prescribed by the statute when the question of issuing the bonds was voted upon by the people, it may be answered that this was a mere irregularity, of which it may be doubted whether the defendant could, under any circumstances, take advantage in a collateral action like this, but clearly it is estopped by the express recitals contained in the bonds from urging such a defense at this time. The same principle is applicable to the contention that the officers of the city violated the statute in delivering the bonds to Coffin & Stanton without the payment of any money, and upon their simple promise to redeem certain outstanding bonds of the defendant and the City Water Company of Santa Cruz. Certainly, the delivery of the bonds under such agreement was a gross violation of the statute; but this is a matter which cannot be permitted to affect such of the assignors of the defendant as were bona fide purchasers without notice, as they had a right to rely upon the express recitals contained in the bonds to the effect that they were issued pursuant to the statute. See Trust Co. v. Mercer Co., 170 U. S. 593, 18 Sup. Ct. 788. In conclusion, upon this point, it may be laid down as a general rule that when municipal bonds recite facts which, if true, show that they were issued upon the conditions and for a purpose authorized by law, the bona fide purchaser, without notice of any infirmity therein, may safely rely upon such recitals. He owes no duty to the municipality, and is not required, for his own protection, to make an investigation for the purpose of ascertaining whether the recitals are true or false, unless

the constitution or statute under which the bonds purport to have been issued expressly or by implication provide that he must look beyond the face of the bonds for the purpose of ascertaining the existence of the facts justifying their issuance. The cases of Dixon Co. v. Field, 111 U. S. 83, 4 Sup. Ct. 315, and Lake Co. v. Graham, 130 U. S. 674, 9 Sup. Ct. 654, as explained in the later case of Chaffee Co. v. Potter, 142 U. S. 355, 12 Sup. Ct. 216, are not opposed to this conclusion; and the same also may be said of Sutliff v. Commissioners, 147 U. S. 230, 13 Sup. Ct. 318. The rule stated is founded, not only upon principles of equity, but is also consistent with public policy, which seeks to give stability and value to this class of negotiable instruments by inviting the confidence of bona fide purchasers for value. The law which determines what the judgment must be upon the facts appearing in this case is clear, and in conclusion what was said in Barnards Tp. v. Morrison, 133 U. S. 523, 10 Sup. Ct. 333, may well be repeated here:

"Whatever may be the hardship of this particular case, to sustain the defenses pressed would go far towards destroying the market value of municipal securities."

Judgment must be entered in favor of the plaintiff for the amount demanded, less the sum of the three coupons assigned to plaintiff by the Northern Counties Investment Trust Company, Limited.