# PROVIDENT LIFE & TRUST COMPANY *v.* MERCER COUNTY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

Argued April 29, May 2, 1898. — Decided May 23, 1898.

The transactions with the county of Mercer, which resulted in the delivery of the bonds of the county to the railroad company, were had in the utmost good faith.

*Barnum* v. *Okolona*, 148 U. S. 393, reaffirmed to the point "that municipal corporations have no power to issue bonds in aid of railroads, except by legislative permission; that the legislature, in granting permission to a municipality to issue its bonds in aid of a railroad, may impose such conditions as it may choose; and that such legislative permission does not carry with it authority to execute negotiable bonds, except subject to the restrictions and conditions of the enabling act." But when the good faith of all the parties is unquestionable, the courts will lean to that construction of the statute, which will uphold the transaction as consummated.

The provision in the act authorizing the issue of Mercer County bonds to the Louisville Southern Railroad Company, when its railway should have been so completed "through such county that a train of cars shall have passed over the same, was fully complied with when the railroad was so completed, from the northern line of the county to Harrodsburg, that a train of cars passed over it; but, even if this construction be incorrect, it must be held that when the trustee, in whose hands the county bonds were placed in escrow, adjudged that the condition prescribed for their delivery had been complied with, and delivered the bonds to the railroad company, the company took such a title as, when the bond was transferred to a *bona fide* holder, would enable him to recover against the county, even if the condition had in fact not been performed.

On May 15, 1886, the general assembly of the Commonwealth of Kentucky passed an act, c. 1159, Private Acts,

entitled " An act to authorize the county of Mercer to sub-
scribe aid to the Louisville Southern Railroad Company," the
first section of which is as follows :

· " Sec. 1. That the county of Mercer may subscribe to the
capital stock of the Louisville Southern Railroad Company
as hereinafter provided, and may pay therefor, in the
negotiable coupon bonds' of said county, payable not more
than thirty years after date, and bearing interest at a rate
not to exceed six per centum per annum, payable semi-
annually; and which bonds and interest shall be payable at
a place designated therein."

The second and third sections contain provisions in detail
in respect to a vote of the people of the county, the subscrip-
tion to the stock of the company and the execution of the
bonds. The·fourth section reads :

" Sec. 4. The said bonds shall not be binding · or valid
obligations until the railway of the said company shall have
been so completed through such county·that a train of cars
shall have passed over the same, at which time they shall be
delivered to said railroad company in payment .of the sub-
scription of such county, and the county shall thereupon be
entitled to receive certificates for the stock subscribed, and
the county judge of such county shall order that such bonds
·shall be deposited with a trustee or trust company, to be held
in escrow, and delivered to the said railroad company when
it shall become entitled to the same by the construction of its
road . through such county: *Provided, however,* That such
trust company or trustee shall, before receiving such bonds,
.give · bond, with good surety, approved by the county judge,
for the faithful performance of his or its duty in the
premises : *And provided further,* That no such subscription
shall be binding unless such railroad shall pass to or through
the corporate limits of the town of Harrodsburg."

In pursuance of this act an election was held in the county,
resulting in favor of making the subscription and issuing the
bonds. The subscription was made and the bonds executed.
The. bonds were, omitting a provision for repayment, in the
following form :

"UNITED STATES OF AMERICA.

"$1000.                                             No. 105.

"LOUISVILLE SOUTHERN RAILROAD AID BONDS.

"*County of Mercer, State of Kentucky.*

"The County of Mercer, in the State of Kentucky, hereby acknowledges itself indebted and promises to pay to the Louisville Southern Railroad Company, or bearer, the sum of $1000 on or before the tenth day of January, A.D. 1917, at the Louisville Banking Company in the city of Louisville, Kentucky, with interest thereon at the rate of five per cent per annum, payable semi-annually at said bank on the tenth days of July and January after date respectively in each year, on presentation and surrender of the annexed coupons representing such interest. This bond is one of a series of one hundred and twenty-five bonds of even date herewith, all of the same denomination and tenor, and numbered consecutively from one to one hundred and twenty-five, the same having been issued pursuant to the authority conferred upon the said county by an act of the legislature of Kentucky, entitled 'An act to authorize the county of Mercer to subscribe aid to the Louisville Southern Railroad Company,' approved May 15, 1886, and pursuant to an order entered by the county judge of said county in conformity with said act subscribing in behalf of said county for the capital stock of the Louisville Southern Railroad Company in the sum of $125,000, which order was entered of record in said court on January 10, A.D. 1887.

*       *       *       *       *

"In witness whereof, the County of Mercer, by John W. Hughes, county judge thereof, has in the name and on behalf of said county subscribed and executed this bond, and the same has been attested by the county clerk of said county, with his official seal affixed hereto, and the interest coupons attached thereto have been signed by the said clerk.

"Done on the tenth day of January, A.D. 1887.

"THE COUNTY OF MERCER,   [SEAL.]

"By JOHN W. HUGHES, *County Judge.*

"Attest: BEN. C. ALLIN, *Clerk.*"

On February 7, 1887, the county court appointed D. L. Moore trustee, as prescribed by section 4 of the act, Moore accepted the trust and gave bond with good surety, as required, and on March 3, 1887, the bonds were deposited with him.

Prior to June 1, 1888, the railroad was completed from Louisville, in Jefferson County, via Shelbyville, in Shelby County, and Lawrenceburg, in Anderson County, south through Mercer County to the depot of the Southwestern Railroad in Harrodsburg, the county seat; there it connected with a short line of road constructed by the Southwestern Railroad Company, and extending from Harrodsburg to Burgin, on the Cincinnati Southern Railroad; the Southern Company owned all the stock of the Southwestern Company, had possession of its road, and subsequently the two companies were consolidated and the latter merged in the former company. On said first day of June, 1888, a train of cars, moved by an engine, passed over the road from Louisville through Harrodsburg to Burgin and then returned to Louisville, and from that time the railroad from Louisville to Burgin has been continually operated as the Louisville Southern Railroad. The distance from the northern line of Mercer County to Harrodsburg is fifteen miles, from Harrodsburg to Burgin, 4.72 miles. Burgin is three miles from the south line of Mercer County and 4.74 miles from the east line. The nearest point that the road runs to the south line of Mercer County is two miles.

On July 3, 1888, Moore resigned his position as trustee, and Isaac Pearson was appointed in his place. He gave security to the county, as required by the act, and received from the prior trustee all the bonds and coupons in his hands. About the first of June, 1888, the time of the passage of a train of cars from Louisville to Burgin and back, as hereinbefore stated, there arose a question whether the condition precedent to the delivery of the bonds had been complied with by the railroad company, and it was in view of this difference of opinion and the doubts of the trustee Moore that he resigned his position. This question was publicly and generally discussed, and while the discussion was going on, and before Pearson, the trustee, had determined that the condition precedent had been per-

formed and that he would deliver the bonds, the railroad company prepared to extend its road toward and to the town of Danville, in Boyle County, which was 7.47 miles distant from Harrodsburg, and with one exception acquired all the rights of way to the southern line of Mercer County. A movement was made in the county to have the court of claims of the county instruct the trustee as to his duty in the premises, and that court, consisting of the county judge and the justices of peace of his county, met on June 26, 1888, and the question was fully discussed before them. After argument they declined to instruct the trustee as to his action, but, upon motion of one of the justices, passed and spread upon the records this resolution:

"At a county court of claims for Mercer County, at the court house in Harrodsburg, on Tuesday, the 26th day of June, 1888.

"Present: John W. Hughes, J. P. M. C. C., and M. Cummins, C. B. Connor, James Yeast, Sr., A. S. Hendrew, John W. Reed, E. R. Norton, R. L. Mullins, E. I. Massie, N. Harris, G. J. Johnson, B. O. Jones, A. Johnson, J. C. McIntire and John T. Pankey, justices of the peace of Mercer County.

"G. J. Johnson, as justice of the peace of this county, offered into the court the following motion, which is ordered to be noted of record, and is as follows:

"'The members of this court do not believe that they have any right to enter an order directing the trustee to deliver the bonds of this county to the Louisville Southern Railroad, but as individuals they are of the opinion that such delivery should be made and the construction of the railroad not forced to the Boyle County line.'

"And said motion being seconded, the ayes and nays were taken, and resulted as follows:

"Ayes, 12, as follows: M. Cummins, C. B. Connor, James Yeast, Sr., A. S. Hendrew, John W. Reed, E. R. Norton, R. L. Mullins, N. Harris, G. J. Johnson, B. O. Jones, J. C. McIntire and John T. Pankey.

"Nays, none; not voting, two, as follows: W. I. Massie and A. Johnson."

After this, Pearson, the trustee, decided that the conditions had been performed, and on the — day of August, 1888, in the presence of the county judge of the county, delivered the bonds, first cutting off and burning the past due coupons. At the same time the Louisville Southern Railroad Company delivered to the county its certificate for an equal amount of its capital stock. The stock was accepted by the county and voted by the county judge at a stockholders' meeting on at least two occasions, one on December 18, 1888, and another on May 26, 1890, and the stock certificate is still held by the county of Mercer and has never been tendered to the railroad company, or any one representing it. At these two meetings Mercer County voted its shares in support of certain resolutions materially affecting the business affairs of the railroad company and also accepting a legislative amendment to its charter, as well as in the election of directors. The county regularly levied an annual tax to meet the semi-annual interest on the bonds, and paid such interest for the years 1889, 1890, 1891 and January 1, 1892. Since then it has paid no interest. The Provident Life and Trust Company is a *bona fide* purchaser of $100,000 of the bonds, and on default in payment of the coupons it commenced this action on November 3, 1892, in the Circuit Court of the United States for the District of Kentucky. The pleadings having been perfected, the case was tried before the court without a jury. Special findings of facts were made, and upon them judgment was on April 30, 1895, rendered in favor of the plaintiff. From this judgment the county took the case on error to the Court of Appeals for that circuit. That court, on March 3, 1896, filed an opinion holding the bonds void, 43 U. S. App. 21, and entered a judgment reversing the judgment of the Circuit Court and remanding the case with instructions to enter a judgment in accordance with the opinion. Thereupon, on October 20, 1896, the case was brought to this court on certiorari.

*Mr. Thomas W. Bullitt* and *Mr. Samuel Dickson* for the Provident Life and Trust Company.

*Mr. John B. Thompson* and *Mr. Alexander Pope Humphrey* for Mercer County. *Mr. George M. Davie* was on their brief.

Mr. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

No one can read the facts above stated, as found by the Circuit Court, without being impressed that the transactions between the county and the company, culminating in the delivery of the bonds to the latter, were had in the utmost good faith. There was no misrepresentation, concealment or fraud. The work done by the company in constructing the railroad was obvious and satisfactory. The question whether that work was a compliance with the terms of the subscription was publicly discussed, was fully considered at a meeting of the county court of claims, whose opinion was, and was so expressed, that the contract had been fully complied with, and that the bonds ought to be delivered. Prior to the time that such conclusion was reached the company, in view of the question, commenced its preparations to construct the road to the south county line, and had obtained, with a single exception, the necessary right of way therefor. When advised by the opinion of the court of claims that the construction of the additional two miles of road was unnecessary, and the judgment of the trustee was announced that he considered the contract of subscription fully complied with, the company desisted and took the bonds. The county accepted the stock issued by the company, voted upon it at stockholders' meetings, and has ever since retained it. For three years and a half it paid the interest on the bonds, without questioning their validity. So that if good faith on the part of all concerned was the sole condition of the validity of these bonds, no question could be made concerning it.

We do not mean to imply that good faith is the only requisite, or that a condition plainly prescribed by the legislature can be ignored by a county, even with the best of intentions. On the contrary, we reaffirm the proposition laid down in *Barnum* v. *Okolona*, 148 U. S. 393, 395 :

" That municipal corporations have no power to issue bonds in aid of a railroad except by legislative permission; that the legislature, in granting permission to a municipality to issue its bonds in aid of a railroad, may impose such conditions as it may choose; and that such legislative permission does not carry with it authority to execute negotiable bonds except subject to the restrictions and conditions of the enabling act, are propositions so well settled by frequent decisions of this court that we need not pause to consider them. *Sheboygan County* v. *Parker*, 3 Wall. 93, 96; *Wells* v. *Supervisors*, 102 U. S. 625; *Claiborne County* v. *Brooks*, 111 U. S. 400; *Young* v. *Clarendon Township*, 132 U. S. 340, 346."

At the same time when the good faith of all the parties is unquestionable the courts will lean to that construction of the statute which will uphold the transaction as consummated. Especially will that be so in a case in which the question of construction having been raised the one party commences preparations to perform work which will put the matter beyond question and desists therefrom only upon the representations of the other party that it is satisfied the work has been completed according to the terms of the contract. As said in *Andes* v. *Ely*, 158 U. S. 312, 321:

"While courts may properly see to it that proceedings for casting burdens upon a community comply with all the substantial requisitions of a statute in order that no such burden may be recklessly or fraudulently imposed, yet such statutes are not of a criminal character, and proceedings are not to be so technically construed and limited as to make them a mere snare to those who are encouraged to invest in the securities of the municipality. These considerations are appropriate to this case. The proceedings on the part of the town and the railroad company were carried on in evident good faith. No one questioned their validity, no effort was made to review the action of the county judge, the bonds were issued, more than $100,000 was spent within the limits of the town in the construction of the road, and years went by during which the town paid the interest and part of the principal before any question was made as to their validity."

See also *Mercer County* v. *Hacket*, 1 Wall. 83; *Van Hostrup* v. *Madison City*, 1 Wall. 291; *Ray County* v. *Vansycle*, 96 U. S. 675.

With these preliminary observations, we pass to a consideration of the questions presented; and in the first place it must be noticed that no matter of constitutional limitation is involved. The only inquiry is whether the conditions prescribed in the statute have been fully complied with, and, if not, whether the county is in a position to avail itself of the non-compliance. The statute in terms authorizes the issue of negotiable bonds. The bonds are negotiable, and issued by the proper county officers; carry on their face recitals that they have "been issued pursuant to the authority conferred" by an act of the legislature, which is named, and "pursuant to an order entered by the county judge of said county in conformity with said act subscribing in behalf of said county for the capital stock" of the railroad company. By a long series of decisions such recitals are held conclusive in favor of a *bona fide* holder of bonds that precedent conditions prescribed by statute and subject to the determination of those county officers have been fully complied with. For instance, whether an election has been held, whether at such an election a majority voted in favor of the issue of bonds, whether the terms of the subscription have been complied with, and matters of a kindred nature which either expressly or by necessary implication are to be determined in the first instance by the officers of the county, will in favor of a *bona fide* holder be conclusively presumed to have been fully performed, provided the bonds contain recitals similar to these in the bonds before us. See among other cases *Coloma* v. *Eaves*, 92 U. S. 484; *Warren County* v. *Marcy*, 97 U. S. 96; *Buchanan* v. *Litchfield*, 102 U. S. 278; *Northern Bank* v. *Porter Township*, 110 U. S. 608; *Bernards Township* v. *Morrison*, 133 U. S. 523; *Citizens' Savings Ass'n* v. *Perry County*, 156 U. S. 692; *Andes* v. *Ely*, 158 U. S. 312.

But it is said that the recitals in this case can be held conclusive only as to matters transpiring before the placing of the bonds in the hands of the trustee, such as the election,

etc., because by section 4 of the statute the bonds, when executed, were to be deposited with a trustee, to be held in escrow and delivered only upon the performance of a certain condition — a condition to be performed subsequently to the execution of the bonds.    Assuming, without deciding, that such limitation must be placed upon the recitals, we pass to inquire whether that condition was in fact performed, and if not, whether after delivery by the trustee the county can be permitted to raise the question as against *bona fide* holders. That condition is that the bonds shall not be binding "until the railway of the said company shall have been so completed through such county that a train of cars shall have passed over the same." It is contended that the word "through" means clear through the county from one end to the other; and that while the railway enters on the north line of the county, and runs within the county limits a distance of nearly twenty miles, it does not touch the south county line, nor come within a nearer distance of it than two miles.    So it is said the railway does not run through the county, and therefore the condition upon which the bonds could become binding and valid obligations did not and does not exist.    It is true the primary meaning of the word "through" is from end to end, or from side to side, but it is used in a narrower and different sense.    Its meaning is often qualified by the context.    Thus, if one should say that he had spent the summer travelling through New England it would not be understood as carrying an affirmation that he had been from one side clear to the other or from one end clear to the other, but that his travels had been within the limits of New England.    That book which is said to have had a wider circulation than any except the Bible, Bunyan's Pilgrim's Progress, opens with this sentence: "As I walked through the wilderness of this world, I lighted on a certain place where there was a den, and laid me down in that place to sleep." Does the writer mean that he passed from one end of the wilderness to the other, and at the further end found the den, or simply that as he travelled in the wilderness he lighted on the den?  Obviously the latter.    Many similar illustrations might

be cited. They show that "through" does not always mean from end to end, or from side to side, but frequently means simply "within." Now, the language here is "so completed through such county that a train of cars shall have passed over the same." Obviously, the primary thought is not the extent of the line, but the extent to which the work shall be completed. In other words, the principal thing is not that a railroad shall be partially completed from one end of the county to the other, but that a railroad shall be so completed within and substantially through the county that a train of cars passes over it. It may well be believed that, inasmuch as the company's road was to commence at Louisville, on the northern border of the State, and its principal city, the purpose was to connect the county with that city, and that the road should be so fully completed as to permit the moving of trains over it, *i.e.*, be in a condition for actual use, and not that a road, no matter how far constructed, should be extended from one end of the county to the other. This view of the intent of the legislature is sustained by the last clause of the section, which provides "that no such subscription shall be binding unless such railroad shall pass to or through the corporate limits of the town of Harrodsburg." This contemplates that the line coming from the north shall enter the county and pass through it so far as to reach the corporate limits of the town of Harrodsburg, that town being the county seat. The proviso is not that the road in passing through the county shall touch or pass through the town of Harrodsburg, but simply that it shall pass to or through that town, and either is sufficient. It seems not an unreasonable construction of this statute that the condition of subscription was fully complied with when the railroad was so completed from the northern line of the county to Harrodsburg, the county seat, that a train of cars passed over it. If that be the correct construction, then of course we need inquire no further; and, on the other hand, if though not correct, it be not an unreasonable construction, the court should, in view of the unquestioned good faith of both parties, of the fact that it was adopted by the authorities of the county, and that

Opinion of the Court.

by reason thereof the company desisted from further work — accept, if possible, the interpretation placed by the parties as correct. This view is certainly persuasive.

But if the true, the only permissible, construction be otherwise, and the demand of the statute is that the road be actually constructed from the north to the south line of the county, and so constructed that a train of cars shall have passed over it, then the question arises as to the effect of the decision of the trustee that the condition had been complied with, and of his delivery of the bonds, and their subsequent purchase by a *bona fide* holder. It is said that the bonds were placed in escrow, and that when an instrument is so placed there can be no valid delivery until the condition of the escrow has been performed, and if without performance the instrument passes out of the hands of the one holding it in escrow it is not enforcible against the maker, and that in a suit on the instrument the inquiry is always open whether the condition of the escrow has been performed. Whatever may be the rule in case the instrument so placed in escrow be a deed or non-negotiable contract, we are of opinion that a different rule obtains when the instrument is a negotiable obligation.

"It is generally agreed that a delivery of negotiable paper left in escrow, contrary to the terms upon which it was to have been delivered, will pass a good title to the *bona fide* transferee for value and before maturity." *Long Island Loan & Trust Co.* v. *Columbus &c. Railway*, 65 Fed. Rep. 455, 458.

In *Fearing* v. *Clark*, 16 Gray, 74, 76, Chief Justice Bigelow thus states the law:

"The rule is different in regard to a deed, bond or other instrument placed in the hands of a third person as an escrow, to be delivered on the happening of a future event or contingency. In that case, no title or interest passes until a delivery is made in pursuance of the terms and conditions upon which it was placed in the hands of the party to whom it was entrusted. But the law aims to secure the free and unrestrained circulation of negotiable paper, and to protect the rights of persons taking it *bona fide* without notice. It therefore makes the consequences, which follow from the negotia-

tion of promissory notes and bills of exchange through the fraud, deception or mistake of those persons to whom they are entrusted by the makers, to fall on those who enable them to hold themselves out as owners of the paper *jure disponendi*, and not on the innocent holders who have taken it for value without notice."

In *Burson* v. *Huntington*, 21 Michigan, 415, 433, it is said: " If the maker or endorser, before delivery to the payee, leave the note in the hands of a third person as an escrow, to be delivered upon certain conditions only, . . . and the person to whom it is thus entrusted violate the confidence reposed in him, and put the note into circulation; this, though not a valid delivery as to the original parties, must, as between a *bona fide* holder for value, and the maker or endorser, be treated as a delivery, rendering the note or indorsement valid in the hands of such *bona fide* holder."

See also *Vallett* v. *Parker*, 6 Wend. 615, 620 ; *Chase National Bank* v. *Faurot*, 149 N.Y. 532 ; *Graff* v. *Logue*, 61 Iowa, 704.

Within these authorities it must be held that when the trustee adjudged that the condition had been complied with and delivered the bonds the railroad company took such a title as, transferred to a *bona fide* holder, enabled him to recover against the county, notwithstanding the condition had in fact not been performed. That the trustee was the agent of the county and responsible to it for the manner in which he discharged this duty is obvious from the provision in the statute that he shall give " bond, with good surety, approved by the county judge, for the faithful performance " of his duty. If in case the condition was not performed the county had a perfect defence to the bonds, even in the hands of a *bona fide* holder, there were little need of requiring the trustee to give any security.

Another significant feature in this connection is the fact that by statute the bonds were to be negotiable. Counsel for the county suggest that this provision of the statute can be satisfied by giving to the bonds the benefit of negotiability as between successive holders, but we know of no reason why the general significance of the word " negotiable " should be

so limited. The third of the three peculiar and distinguishing characteristics of negotiable instruments, as stated in 1 Daniel on Negotiable Instruments, sec. 1, is respecting the consideration, and the author says:

" As between immediate parties, the true state of the case may be shown and the presumption of consideration rebutted. But when a bill of exchange or negotiable note has passed to a bona fide holder for value and before maturity, no want or failure of consideration can be shown. Its defects perish with its transfer ; while, if the instrument be not a bill of exchange or negotiable note, they adhere to it in whosesoever hands it may go."

To hold that by this provision the legislature intended that the quality of negotiability should inhere in the instruments only as between the successive holders, and not between the maker and any bona fide holder, cannot be justified by any reasonable construction of the language used.

It follows from these considerations that these bonds in the hands of the Life and Trust Company, a bona fide holder, must be adjudged the valid obligations of the county.

*The judgment of the Court of Appeals is therefore reversed and the judgment of the Circuit Court is affirmed.*