The **PENNSYLVANIA RAILROAD COMPANY**, Appellant,

v.

The **CHESAPEAKE & OHIO RAILROAD COMPANY**, and The **Louisville & Nashville Railroad Company**, Appellees.

No. 12346.

United States Court of Appeals
Sixth Circuit.

Feb. 7, 1956.

Thomas W. Bullitt, Louisville, Ky., Wm. Marshall Bullitt, R. Lee Blackwell, Bullitt, Dawson & Tarrant, Louisville, Ky., on brief for appellant.

Porter M. Gray, Ashland, Ky., Wm. L. Wallace, Lexington, Ky., Strother Hynes, Richmond, Va., on brief, for appellee C. & O. R. R.

James Park, Lexington, Ky., Charles S. Landrum, Lexington, Ky., for appellee L. & N. R. R.

Before SIMONS, Chief Judge, and MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

This case possesses novelty, but, when analyzed, is not difficult to decide.

On July 14, 1919, in a conference among their representatives—superintendents, train masters and chief clerks—three interstate railroad carriers, being operated by the United States Railroad Administration, reached an agreement to cover "handling the interchange" among their lines, including the use of a railroad bridge owned by one of the carriers. The agreement was to become effective on August 1, 1919. The three contracting parties were The Pennsylvania Railroad Company, The Chesapeake & Ohio Railway Company, and The Louisville and Nashville Railroad Company: all parties to this action.

The Louisville and Nashville owned a railroad bridge which spanned the Ohio River from a point in Newport, Kentucky, to a point on the opposite shore in Cincinnati, Ohio. The agreement provided for billing among them for use of the engines and crews of the respective carriers, and contained this important clause: "(8) Each road to consider engines and crews of the other road, while on its rails, as its own and to be responsible for any and all accidents or damage thereto or thereby, except that in the operation of Pennsylvania and C&O engines on L&N rails, between Newport, Ky., and Pt. Isabella, the L&N Railroad will not be responsible for accidents, losses, damages and injuries to persons or property if caused by defective equipment, and will look for reimbursement therefor to the delivering line. Liability to be determined by joint investigation by roads involved."

During 1921, correspondence among the carriers confirmed their understanding of Clause 8 of the agreement of July 14, 1919. For instance, on October 20, 1921, the Superintendent of the Chesapeake & Ohio Railway Company wrote the Superintendents of the Pennsylvania and Louisville & Nashville railroads a letter containing the following paragraph: "With reference to the liability clause, the way we understand it is that each road will be responsible for any and all accidents and damage to property occurring while on its rails regardless of whose engine or crew is involved, with the single exception that the L&N will not be responsible for any accidents due to defective equipment, and, in such instances, will look to the delivering line for reimbursement."

Nearly eleven years later, on March 29, 1932, the Superintendent of the Pennsylvania Railroad wrote the Superintendents of the Chesapeake & Ohio and Louisville & Nashville railroads a letter containing the following paragraph: "So far as our records indicate, the agreement of July 14, 1919, has never been abrogated, and is still in effect; but in order to avoid any future controversy as to the time of engines, personal injuries or damage of any kind while C&O or PRR engines and crews are on L&N rails, I feel that it would be well, in view of some doubt which seems to exist

at this time, for each of us to have in our files a letter showing that the 1919 agreement is still in effect, except insofar as it conflicts with the agreement of October 29, 1926, between the L&N and PRR." [From the amended and substituted answer of the Louisville & Nashville, it appears that on October 29, 1926, the Louisville & Nashville and the Pennsylvania entered into a separate written agreement in relation to the interchange between the Lower and Undercliff Yards of the Pennsylvania and the yards of the Louisville & Nashville at Latonia and DeCoursey, Kentucky, over the Newport-Cincinnati Bridge. This supplemental agreement was evidently immaterial to the issue here involved.] Responsive letters from the superintendents of the other two railroads confirmed the continuing effectiveness of Clause 8 of the agreement of July 14, 1919.

We think, as did the United States District Judge, that it was established that Clause 8 was in effect on October 5, 1946, at the time of the occurrence of the unusual accident which was causative of this litigation.

In the Cincinnati area, there had long been heavy interchange traffic among these three important railway systems. The agreement of July 14, 1919 obviously was made to expedite this traffic. The only railroad bridge available for this interchange traffic over the Ohio River leads into Cincinnati, Ohio, from the Kentucky side, and is owned by the Louisville & Nashville Railroad Company. The Chesapeake & Ohio Railway line enters Newport, Kentucky, on the south side of the Ohio River and there intersects a line of the Louisville & Nashville. The Chesapeake & Ohio has a railroad yard some seven or eight miles from Newport; and the yards of the Louisville & Nashville are located at nearby DeCoursey and Latonia, Kentucky. These two carriers make up trains in their respective yards.

Across the Ohio River, the Pennsylvania has constructed its railroad in the State of Ohio to a point of intersection with the Louisville & Nashville lines on the north side of the river. Its railroad tracks do not enter the State of Kentucky. On the Kentucky side of the Ohio River, the Chesapeake & Ohio trains are compelled to use a portion of the Louisville & Nashville tracks to reach the bridge and to travel over it.

In the early morning hours of October 5, 1946, a Chesapeake & Ohio train, pulled by Engine No. 981, was made up in its yard to be carried over its tracks into Newport, thence over part of the Louisville & Nashville tracks in Newport; and then over the latter's tracks on its railroad bridge to Point Isabella, where the Louisville & Nashville tracks converge into those of the Pennsylvania Railroad. It was intended that the Chesapeake & Ohio train should proceed from Point Isabella over the Pennsylvania Railroad tracks into the Undercliff Yard of the Pennsylvania. The Chesapeake & Ohio train consisted of a steam locomotive engine (No. 981), thirty loaded cars, two empties, and a caboose. Tests of the condition of the engine and cars were made at its yard. All equipment was found to be in satisfactory condition for transportation of the train. The Chesapeake & Ohio train proceeded over its own tracks to Newport; and, after some switching had taken place there, traveled on to the Louisville & Nashville tracks. Further tests of its equipment were made; and all was found again to be in satisfactory working shape.

At Newport, a Louisville and Nashville engine was attached to the rear of the Chesapeake & Ohio train to aid it up the incline of the Louisville & Nashville bridge. The operator of the Chesapeake & Ohio in the road's tower in Newport communicated with the Louisville & Nashville dispatcher, who, in turn, communicated with the operator or dispatcher of the Pennsylvania Railroad in its tower on the Ohio side of the river. After some conversation between the dispatchers, and by mutual understanding, the Chesapeake & Ohio train, pulled by its engine No. 981 and pushed from

the rear by the Louisville & Nashville engine, was given clearance to pass over the bridge. The Chesapeake & Ohio train entered upon the Louisville & Nashville tracks, climbed the ascending grade of the bridge after passing through the streets of Newport, and reached the top of the grade without incident.

The engineer, in conformity with customary practice, undertook to stop before the entire train passed over the apex of the bridge. He applied his service air brakes for the evident purpose of releasing the Louisville & Nashville pusher engine and then proceeded in usual fashion down-grade to the intersection with the Pennsylvania tracks. But he could not accomplish his purpose. As was said by the trial judge: "There is not the slightest indication in this proof that that engineer expected to do anything except to observe the rules and to observe the customary procedure. There is nothing to indicate that he intentionally or maliciously ran the red light located at the entrance to the Pennsylvania tracks. Unfortunately, those brakes didn't hold. What caused those brakes to fail is a matter of dispute; but whatever caused it, they didn't hold. The train gathered momentum as it descended from the bridge. The engineer blew his whistle. He realized what was about to happen and he wanted to avoid, as far as possible, hurting anybody. He blew that whistle when he discovered that his train had become out of control. It was out of his control. He was entirely helpless, as far as controlling that train was concerned."

A long west-bound Pennsylvania train was waiting on one of its own tracks in Cincinnati, for the purpose of traveling south over the Louisville & Nashville bridge after the Chesapeake & Ohio train had crossed the river and passed the intersection of the Louisville & Nashville tracks with the Pennsylvania tracks. The Pennsylvania operator had told the Louisville & Nashville dispatcher that the Pennsylvania train was waiting to pass over the bridge after the Chesapeake & Ohio train had crossed it. This operator had control of the switches at Point Isabella. He knew that, if the switches were not turned at Point Isabella, the Chesapeake & Ohio train—unless stopped before reaching the intersection—would come onto the westbound track on which the Pennsylvania train was standing. The Chesapeake & Ohio train's planned routing was that the train should pass over the east-bound Pennsylvania tracks to the Undercliff Yard of the Pennsylvania, which was about a mile and a half away. The Pennsylvania operator did not change the switches; and the Chesapeake & Ohio train, pulled by its engine, No. 981, ran past the stoplight signal at Point Isabella and collided with the engine of the waiting Pennsylvania train. The engineer and head brakeman on the engine of the Pennsylvania train were injured seriously; and the engineer on the Chesapeake & Ohio train was slightly hurt.

By agreement among the three railroads, the Chesapeake & Ohio was authorized to settle the claims of the injured employees for the account of the railroad or railroads ultimately liable. Settlement was made with the Pennsylvania engineer for $25,000; with the Pennsylvania brakeman for $60,000; and with the Chesapeake & Ohio engineer for $200.

The Chesapeake & Ohio Railway Company brought this action in the United States District Court for Eastern Kentucky, against the Louisville & Nashville and Pennsylvania railroads, to recover the amounts expended by it in settlement of the aforementioned claims and for damage to its engine. The Pennsylvania Railroad Company denied liability and filed a counterclaim against the Chesapeake & Ohio and a cross-claim against the Louisville & Nashville for damage to its engine and equipment, and for its other expenditures occasioned by the accident. The Louisville & Nashville also denied liability for the accident and resultant injuries. The case was tried to a jury, but resulted in directed verdicts.

Following its action in directing a verdict in favor of the Chesapeake & Ohio against the Pennsylvania and a verdict discharging the Louisville & Nashville from liability, the district court entered judgment in favor of the Chesapeake & Ohio against the Pennsylvania Railroad Company for $118,660.69, consisting of the principal sums of itemized loss and damage and the interest on such amounts as allowed in the orders of the court. The Pennsylvania Railroad Company has appealed from the judgment against it in favor of the Chesapeake & Ohio Railway Company, and from the order dismissing its cross-claim against the Louisville & Nashville. No appeal was taken by the Chesapeake & Ohio from the judgment dismissing its action against the Louisville & Nashville.

In directing the verdicts, Judge Ford took pains to explain to the jury the underlying reasons for his action. He pointed out that there is no ambiguity in the contract of July 14, 1919; that the words used are clearly expressive of the mutual understanding of the three carriers. He alluded to the single exception stated in the contract that, in the operation of the Pennsylvania and Chesapeake & Ohio engines on Louisville & Nashville rails, the Louisville & Nashville would not be responsible for accidents, losses, damages and injuries to persons or property, if caused by defective equipment used by the other two roads.

The judge rejected the argument of the Pennsylvania that an exception, eliminating from the contract its responsibility for damages, should be implied in the circumstances of the case. He stated that where a contract *unreasonably* places absolute responsibility upon a party an exception may be implied, as likewise it may be when the letter of a contract cannot be enforced without violating essential public policy. The judge declared his conviction that no such situation exists in the instant case; and asserted his view that the only purpose of the agreement in controversy was to fix the liability of three railroad companies, all engaged in close relationship involving mutual hazards which might result in difficult and complicated litigation to determine the wrongdoer in the event of casualty. The agreement reached was considered fair to all and it was concluded that the intelligent railroad officials who made the agreement had expressed their understanding so clearly, carefully and thoroughly that their purpose could not be misunderstood or evaded.

Judge Ford told the jury: "Everybody obviously recognized that the human element would always be involved in the operation of heavily loaded trains necessarily dependent upon effective use of air brakes by the engine crew to enable them to stop, and that at some time the engineer, however conscientious, might be unable to stop his train in observance of signals or regulations. It seems quite clear that this contract was designed to determine the liabilities as between the participating railroads arising out of some failure of the human factor that necessarily plays so great a part in the operation of railroads, as well as the failure of mechanical factors.

"My idea is that it was well known to the parties to the contract that on some occasions and under many circumstances neither the most carefully devised safety rules nor signal lights would prevent accidents.

"* * * My conclusions are that, as a matter of law, the contract that these contracting parties made in 1919 was in force and effect on the 5th of October, 1946, and governed the liabilities as between them. They agreed that the Chesapeake and Ohio would settle these cases that were filed against them, and that after they did so, the liabilities under this contract would be determined by litigation. That's the reason we have to determine it. My conclusion is the Pennsylvania Railroad is responsible under this contract for the damage that occurred, for the recovery of which this suit is instituted. It is true that the engine of the C. & O. train became out of control while it was on the tracks of

the L. & N. Railroad, and we have heard a good deal of proof as to why it became out of control; but what we are seeking here is to determine who is responsible for the damages that were suffered while the train was on the tracks of the Pennsylvania. This contract says that the railroad shall be responsible for any accident or damage caused by or to a train while on its tracks. The damages caused by the train while on the track were the damages resulting from the collision. Whether you call the collision the accident, or whether you call the loss of control the accident, the damage was the result of the collision. There was no damage on the L. & N. track. Nobody was hurt on its tracks. The situation might be different if we were dealing with tort liability. We are dealing only with contract liability."

We think the trial judge was correct in applying the cold steel of the letter of the contract to decision of the case; and that the reasoning of his oral opinion supported his conclusion. At the trial, the testimony of twenty-six witnesses was introduced, either by oral examination or by deposition. Much of this evidence was descriptive of physical circumstances; much of it was introduced to determine whose negligence caused the accident; and much related to the equipment in use—more especially the air brakes. But the case on trial was an action *ex contractu* and not an action *ex delicto*.

The Pennsylvania stressed at the trial, and now emphasizes on appeal, that its responsibility under the contract was only for all accidents or damage occasioned by the Chesapeake & Ohio engines and crews while on Pennsylvania rails, when such rails were being used with the prior consent and permission of the Pennsylvania Railroad. It insists, further, that the Chesapeake & Ohio engine and train "knowingly and unlawfully burst through all the Pennsylvania Railroad's many 'stop' signals, and collided with a Pennsylvania Railroad freight train 'standing still' and 'at rest' on the Pennsylvania Railroad's own rails."

On the record in the case, there is no justification whatever for the argument that the operator of the Chesapeake & Ohio engine was guilty of knowingly and unlawfully invading the Pennsylvania's tracks. The evidence makes it clear beyond controversy that he was powerless to stop his train. Indeed, several expert witnesses testified to the effect that the air brakes on the Chesapeake & Ohio train became inoperative for the reason that the cut-out valve of the Louisville & Nashville pusher engine was restoring air to the brake pipes of the Chesapeake & Ohio train faster than the brake valve of the latter's engine, No. 981, was able to draw the pressure down. This was the apparent reason why the Chesapeake & Ohio engineer could not stop his train.

 There is nothing in the contract to support the argument of Pennsylvania that prior permission to use its tracks was necessary in every instance. The contract gave broad authority for general use by each road of the rails of the others. The contract provided plainly that each road would consider the engines and crews of the other roads, while on its rails, as its own, and would be responsible for all accidents or damage thereto or thereby. To adopt the construction sought by Pennsylvania would be to remake the contract for the parties by adding a condition which they did not write into it. It is true that the Chesapeake & Ohio train ran past the stop signal of the Pennsylvania in violation of rules and regulations; but the Chesapeake & Ohio was out of control and the train was, therefore, a run-away. So, in no aspect, unless negligence is made the criterion of liability, could the Chesapeake & Ohio Railway Company be held responsible for the damage resultant from the collision on the Pennsylvania tracks. The strict letter of the contract obviously was intended to be controlling upon the issue of liability.

As to the matter of negligence, the Chesapeake & Ohio urges that, had the Pennsylvania switch been aligned properly, there would have been no accident; and that the failure to set it properly

was negligence upon the part of the Pennsylvania. But, let it be said again that the decision of this case does not turn upon issues of negligence. It rests upon the construction of the existing contract.

In support of its argument that a strictly literal construction of the contract should not be indulged, Pennsylvania cites United States v. Kirby, 7 Wall. 482, 74 U.S. 482, 19 L.Ed. 278; Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Niven v. United States, 9 Cir., 169 F. 782; Provident Life & Trust Co. v. Mercer County, 170 U.S. 593, 18 S.Ct. 788, 42 L.Ed. 1156; Uphoff v. Industrial Board, 271 Ill. 312, 111 N.E. 128, 130, L.R.A.1916E, 329; and other cases. These cases all concern the construction of statutes rather than contracts; and no one of them is closely in point on its facts. But, assuming—as we think we should—that the same principles of statutory construction derived from them applies to the interpretation of contracts, we must bear in mind what the Supreme Court said in Crooks v. Harrelson, 282 U.S. 55, 59–60, 51 S.Ct. 49, 50, 75 L.Ed. 156: "The principle sought to be applied is that followed by this court in Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; but a consideration of what is there said will disclose that the principle is to be applied to override the literal terms of a statute only under rare and exceptional circumstances. The illustrative cases cited in the opinion demonstrate that to justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense. Compare Pirie v. Chicago Title and Trust Company, 182 U.S. 438, 451, 452, 21 S.Ct. 906, 45 L.Ed. 1171. And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail. Treat v. White, 181 U.S. 264, 268, 21 S.Ct. 611, 45 L.Ed. 853. Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. [Citing authority.] It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation."

The Holy Trinity Church case held that it was not a violation of an Act of Congress prohibiting the importation of aliens under agreements to perform labor in this country for a religious society to bring to the United States a person engaged to serve as its rector, or minister. Mr. Justice Brewer posed the rhetorical question: Could it be believed that Congress intended to make it a misdemeanor for a church in this country to contract for the services of a Christian minister residing in another nation?

In United States v. Kirby, supra, the Supreme Court held that an Act punishing the obstruction, or retarding, of delivery of mail does not apply to a case of temporary detention of mail caused by the arrest of a carrier upon an indictment for murder. Mr. Justice Field said that the same common sense accepted the ruling cited by Plowden that the statute of 1st Edward II, enacting that a prisoner who breaks prison shall be guilty of a felony, does not extend to one who breaks jail when the prison is on fire, for "he is not to be hanged because he would not stay to be burnt." See also United States v. Goldenberg, 168 U.S. 95, 103, 18 S.Ct. 3, 4, 42 L.Ed. 394, where it was said: "No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute."

In Columbia Gas Const. Co. v. Holbrook, 6 Cir., 81 F.2d 417, 419, Judge Simons said for this court: "We are not here concerned with the fairness of the arrangement. The court has no power to make a new contract for the parties, and to strain at construction where the terms are clear would be the writing of an agreement into which the parties had not entered." This language was quoted in Johnson v. Ingleheart Brothers, 7 Cir., 95 F.2d 4, 9.

A court of this circuit, consisting of the three judges presently sitting, affirmed a judgment entered by Judge Miller (then district judge but now a member of this court), and held in its opinion prepared by Judge McAllister that, under Kentucky as well as federal law, a common carrier, not acting in the capacity of a common carrier, may contract against ordinary negligence on its part. We declared that the provision in a lease contract, not being ambiguous, left no room for construction by the court. Franklin Fire Ins. Co. v. Chesapeake & Ohio Ry. Co., 6 Cir., 140 F.2d 898. See also Minneapolis-Moline Co. v. Chicago, M. St. P. & P. R. Co., 8 Cir., 199 F.2d 725, 730, 731.

Among numerous cases which could be cited in support of the literalism which the trial judge applied in interpreting the contract under consideration, see: John P. Gorman Coal Co. v. Louisville & N. R. Co., 213 Ky. 551, 281 S.W. 487; Luton Mining Co. v. Louisville & Nashville R. Co., 276 Ky. 321, 123 S.W. 2d 1055; Baltimore & Ohio R. Co. v. Youngstown Boiler & Tank Co., 6 Cir., 64 F.2d 638; Booth-Kelly Lumber Co. v. Southern Pacific Co., 9 Cir., 183 F.2d 902, 20 A.L.R.2d 695; Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186, 192; Baumer v. Franklin County Distilling Co., 6 Cir., 135 F.2d 384, 389; Elkhorn & Jellico Coal Co. v. Sandlick Coal Co., 305 Ky. 348, 204 S.W.2d 330; J. V. McNicholas Transfer Co. v. Pennsylvania R. Co., 6 Cir., 154 F.2d 265; Thomas v. Atlantic Coast Line R. Co., 5 Cir., 201 F.2d 167, 169.

Appellees point out that, under the provision of item No. 8 of the contract, the only exception from responsibility of a carrier for accidents or damage occurring on its rails is that in the operation of Pennsylvania and Chesapeake & Ohio engines on Louisville & Nashville rails, the last-mentioned carrier is not to be held responsible for accident, losses, damages and injuries to persons or property if caused by defective equipment. It is urged that, on the principle *expressio unius est exclusio alterius,* all other exceptions to absolute liability imposed by the contract upon the railroad on whose rails the accident, injury or damage occurred are excluded. There is merit in the argument. See Prudential Ins. Co. of America v. Fuqua's Adm'r, 314 Ky. 166, 172, 234 S.W.2d 666, 22 A.L.R.2d 803; Southern Coast Corporation v. Sinclair Refining Co., 5 Cir., 181 F.2d 960.

In its reply brief, appellant emphasizes the following statement by printing it on the front cover: "After the Pennsylvania Railroad Company's 50-page Main Brief was filed [March 22, 1955], the Supreme Court of the United States decided the following three cases, on May 16, 1955, with Opinions of 49 pages: Bisso v. Inland Waterways Corp., 349 U.S. 85 [75 S.Ct. 629, 99 L. Ed. 911]; Boston Metals Co. v. The Winding Gulf, 349 U.S. 122 [75 S.Ct. 649, 99 L.Ed. 933]; United States v. Nielson, 349 U.S. 129 [75 S.Ct. 654, 99 L.Ed. 939] which determined the law on the questions involved in this Case." We are not in accord with appellant's assertion.

In the Bisso case, it was held that a towboat owner may not make a valid contract relieving himself from all liability for his own negligent towage. Its decisions in two earlier cases [The Steamer Syracuse, 12 Wall. 167, 20 L. Ed. 382; and Compania de Navegacion Interior, S. A. v. Fireman's Fund Insurance Company (The Wash Gray), 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787] were followed by the Supreme Court; and the

opinion in Sun Oil Company v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, was distinguished, but not overruled. In the last paragraph of the opinion in the Bisso case, 349 U.S. 95, 75 S.Ct. 629, 635, Mr. Justice Black said: "The rule against contractual exemption of a towboat from responsibility for its own negligence cannot be defeated by the simple expedient of providing in a contract that all employees of a towboat shall be employees of the towed vessel when the latter 'employment' is purely a fiction."

In the Boston Metals Co. case, supra, the Supreme Court applied its holding in the Bisso case (decided on the same day), that, where persons conducting towing operations were in fact acting as employees of the towing company and not as employees of the owner of the towed vessel, the owner of the towed vessel could not be held liable for the negligence of the towing company's employees.

In United States v. Nielson, supra, the court held that a contract between a tugboat company and a ship owner did not authorize recovery by the tugboat company for damage to its own tugboat, resultant from negligent pilotage by the tugboat captain who had gone aboard the ship to direct a moving operation. The court said that clear contractual language might have justified imposition of liability, but that the language of the contract involved did not meet such test.

First, it should be observed that these three cases were in Admiralty; and the first two involved towage agreements. There had been considerable difference of opinion among inferior courts as to whether a towboat might validly contract against all liability for its own negligence. The rule asserted in the Bisso case is, in words of the Supreme Court, "merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees, employers and employees, public service companies and their customers." The court pointed out that increased maritime traffic of today makes it, not less, but more, important that vessels in American ports should be able to obtain towage "free of monopolistic compulsions."

In our judgment, the Bisso, Boston Metals, and Nielson cases do not impair the long-existing doctrine that a common carrier, when not performing its duties as such in relation to shippers and passengers, may lawfully contract for assumed responsibility by another party, for release from negligence, and even from indemnity in cases involving its own negligence. Santa Fe P. & P. Railway Co. v. Grant Bros. Const. Co., 228 U.S. 177, 184, 185, 33 S.Ct. 474, 57 L.Ed. 787; J. V. McNicholas Transfer Co. v. Pennsylvania R. Co., 6 Cir., 154 F.2d 265, supra; Franklin Fire Ins. Co. v. Chesapeake & Ohio Ry. Co., 6 Cir., 140 F.2d 898, supra; Baltimore & Ohio R. Co. v. Youngstown Boiler & Tank Co., 6 Cir., 64 F.2d 638, supra; John P. Gorman Coal Co. v. Louisville & N. R. Co., 213 Ky. 551, 281 S.W. 487, supra; Luton Mining Co. v. Louisville & Nashville R. Co., 276 Ky. 321, 123 S.W. 2d 1055, supra; Direct Transportation Co. v. Baltimore & Ohio R. Co., 96 Ohio App. 204, 121 N.E.2d 565.

Most of the foregoing cases have already been cited to support the literalism in interpretation which the district judge applied to the construction of the contract involved in this case. The cases cited are decisions of Kentucky, Ohio, and federal courts. The contract in controversy was entered into in Ohio, to be performed in that state and in Kentucky. Jurisdiction in the federal court rests on diversity of citizenship; and the law of either Ohio or Kentucky is the applicable law, but it is immaterial which state's law is applied, inasmuch as the doctrine of the Kentucky courts is the same as that of the Ohio courts.

The last point to be considered relates to the interest awarded by the United States District Court. Upon the basis of the authorities cited by the

judge, we think he was correct in holding that the amounts paid by the Chesapeake & Ohio to the Pennsylvania's engineer and its head-brakeman were liquidated demands upon which the Chesapeake & Ohio is entitled to interest from the date of the filing of the complaint. Congoleum-Nairn, Inc., v. M. Livingston & Co., 257 Ky. 573, 581–582, 78 S.W.2d 781; Tapp v. Tapp's Trustee, 299 Ky. 345, 185 S.W.2d 534; Schmid v. Anderson, 311 Ky. 1, 222 S.W.2d 931.

In Carrs Fork Coal Co. v. Johnson Drug Co., 249 Ky. 371, 376, 60 S.W.2d 952, 954, it was said: "Another general rule is that one who makes advances for the benefit of another is entitled to interest upon the amount advanced or loaned, although nothing is said about interest at the time of the transaction." See also Abell v. Anderson, 6 Cir., 148 F.2d 372, 375.

The judgment of the district court is affirmed.

See, also, 224 F.2d 275, affirming the order of the District Court, Lester L. Cecil, District Judge, denying writ of habeas corpus, and 350 U.S. 949, 76 S.Ct. 324, denying certiorari.